# Nixon's Estate.

*Decedents' estates—Adjudication—Petition to reopen—Surcharge—Contracts—Construction.*

1. A bill of review to reopen an adjudication of the Orphans' Court which has been duly confirmed, will not be granted unless for an error of law apparent on the face of the record, or new matter which has arisen since the decree, or ex gratia upon discovery of new evidence which could not have been previously procured by due diligence. Where the new matter, even if proven, would not be ground for interfering with the adjudication, the bill of review will not be granted.

2. In a proceeding to reopen an adjudication of a decedent's estate and to surcharge accountant with a sum of money received by him as salary, it appeared by the petition and answer that the accountant held an office in a company incorporated in pursuance of a written agreement entered into between the testator and the accountant in the former's lifetime, which agreement was subsequently made part of testator's testamentary disposition of his property; that under the terms of the agreement the accountant was not entitled to receive any salary as such officer so long as testator should continue to own "in his own right" one-half of the

capital stock of the company; and that at the time the salary in question was paid the decedent's estate owned but 3,542 shares out of a total of 9,000 shares, although the estate held other shares, to the number of 1,626, owned by the accountant, as collateral security for an obligation of the latter to the company. *Held,* that the accountant was not prohibited by the agreement from receiving the salary in question.

Argued January 8, 1913. Appeal, No. 239, Jan. T., 1912, by Martin Nixon-Miller, from decree of O. C. Philadelphia Co., July T., 1889, No. 127, dismissing petition for review in Estate of Martin Nixon, deceased. Before FELL, C. J., BROWN, MESTREZAT, POTTER, STEWART and MOSCHZISKER, JJ. Affirmed.

Petition for review of adjudication. GEST, J., filed an opinion as follows:

The facts, so far as they are deemed material, appear from the petition and answer to be as follows:

Martin Nixon died on June 16, 1888, leaving a will dated February 14, 1880, and a codicil dated March 12, 1884. He gave his residuary estate in trust for certain cestuis que trustent, among whom is the present petitioner, upon trusts for his children, which need not be recited. In his will he gave his trustees power to continue his partnership for the residue of its term, or, in their discretion, to incorporate the business. He provided, in that event, that three-fourths of the stock should be issued to his trustees and the remaining one-fourth he bequeathed to William H. Nixon, to be issued in his name and to be paid for by said William H. Nixon by applying thereto the dividends on the stock in excess of $5,000 per annum, the stock to be retained by the trustees as collateral security for its payment, and to be surrendered by the trustees to said W. H. Nixon as fast as paid for in this manner, and that W. H. Nixon should give his undivided time and best efforts to the business of the corporation as required thereby without compensation other than this bequest.

Subsequently to the execution of his will, the testator entered into a contract with W. H. Nixon, dated March 26, 1883, providing, inter alia, for the incorporation of the business, and he, therefore, by codicil dated March 12, 1884, cancelled and annulled the above-recited clauses of his will and in lieu thereof empowered his executors and trustees to carry into execution the said agreement with William H. Nixon.

So far as the provisions of this agreement are relevant the parties agreed to form a partnership for five years from April 1, 1883, until April 1, 1889. William H. Nixon agreed to give his entire time to the business, Martin Nixon so much time as he might deem proper. The profits were to be equally divided, but William H. Nixon's share over a certain amount per annum should accumulate until his capital should reach $220,000. Martin Nixon, however, was to withddraw his capital until it should be reduced to the same amount, $220,000, making the total $440,000. The articles further stated the intention of the parties to incorporate the business upon the dissolution of the partnership by limitation of time or the prior death of either partner, provided for its capitalization at $560,000, the issuance of stock to the partners or their estates, and that the executors of Martin should sell to William, and that he should agree to buy so many shares of stock as should amount to the difference between the number issued to him upon the organization of the corporation and one-half of the total capitalization. This part of William H. Nixon's one-half of the stock was to be paid for by the dividends paid thereon, except that he was to be entitled to retain dividends upon his share of stock up to $10,000 per annum (increased by a supplemental agreement to $15,000). Article XXII then provided: "If the said William H. Nixon should become an officer or employee of the said company, he shall not be entitled to receive any salary therefrom as such officer or employee so long as the said

Martin Nixon shall continue to own in his own right one-half of the capital stock of the said company."

The corporation was duly organized after the death of Martin Nixon by his executors and William H. Nixon, and it would appear that the stock of the corporation was duly issued in compliance with the agreement. George F. Nixon, a son of Martin, who died in 1900, executed by his will a power of appointment vested in him by his father's will, and thus bequeathed one-fourth of the stock held by the trustees. There have been other transfers, so that at the present time the trustees of Martin Nixon's estate own 3,542 shares out of a total of 9,000, and William H. Nixon owns 4,758 shares, of which 1,573 are held by the trustees as collateral security for the payment therefor at par from dividends.

It is now alleged by the petitioner as the basis of his bill of review that William H. Nixon violated the twenty-second article of his agreement with Martin Nixon, in that, being president of the corporation, he received a salary for his services. It is admitted by the answer that he thus received from March 1, 1903, to August 1, 1908, $7,500 per annum, and thereafter to September 1, 1910, his salary was fixed at $6,900 per annum, and from that time to the present at $6,000 per annum, but it has not been drawn since February 1, 1910. It thus appears that William H. Nixon has received as salary approximately $51,000. The petitioner claims that the account of the trustees should be corrected by surcharging William H. Nixon, one of the accountants, with the salary which he thus received.

It is well settled that a petitioner for a review of an account settled and confirmed in the Orphans' Court must show either an error of law apparent on the face of the record or else new matter which has arisen since the decree. Or such review may be allowed ex gratia upon the subsequent discovery of new evidence as to the facts upon which the decree was grounded which could not have been procured by the use of due diligence: Greens'

App., 59 Pa. 235; Cramp's App., 81 Pa. 90; Priestly's App., 127 Pa. 420; Dox's Est., 227 Pa. 606.

It is not claimed by this petitioner that new matter has arisen since the decree, and it is clear that there is no error of law apparent upon the face of the record. The adjudication shows that the accountants have charged themselves as trustees with the balance shown by a previous account to be in their hands, and this balance, less an unimportant credit, was directed to be retained for the purposes of the continuing trust. Nor do we think that the review should be allowed as matter of grace on the ground that the petitioner has subsequently discovered that William H. Nixon has received a salary as president of the Martin and William H. Nixon Paper Company, beginning in March, 1903, contrary to the stipulations of his contract with Martin Nixon, dated twenty years before. To be sure, the petitioner alleges that "at the time of the audit he was unable to put in any objection to said account, for the reason that he had no knowledge of the contents of said article of copartnership, but subsequently a copy of said articles came into his hands"; but the answer of the trustees states facts from which it appears that even if the petitioner did not know of the agreement at the time of the audit, he might have acquired such knowledge by the use of due diligence, as the cases express it. However this may be, it is difficult to see how this court, upon a readjudication of the account, could entertain the petitioner's claim to surcharge William H. Nixon as trustee with the salary received by him from March, 1903, to February, 1910, for even if the salary in question was improperly received by William H. Nixon, he is not necessarily to be surcharged with it as trustee of the estate of Martin Nixon in his account as such trustee. It would appear that the money, if illegally received by William H. Nixon, should be refunded to the corporation from which he took it, for the only interest which the estate of Martin Nixon has in

the question is that of a stockholder in the Martin and William H. Nixon Paper Company; and although the money, if so paid back by William H. Nixon to the corporation, might increase the fund applicable to dividends, in the discretion of the board of directors, or increase the value of the stock held by the estate, it does not follow that this court can compel William H. Nixon to account directly to the estate for what he received. The question which is here argued is one that should rather be raised in the Court of Common Pleas in a proceeding in equity to which the corporation is a necessary party.

But we prefer to decide the claim of the petitioner upon its merits. The answer of William H. Nixon is fully responsive to the averments of the petition touching the matter of the salary received by the respondent as president of the corporation, and, therefore, on this hearing its statements must be taken as true. The respondent denies that he received a salary of $7,500 in 1901, and that he continued to receive the same until and including the year 1910, as averred in the petition, and, on the contrary, states that at a meeting of the directors on February 28, 1903, his salary as president was fixed at $7,500, and that he received a total salary up to February 1, 1910, aggregating about $51,000.

The answer of William H. Nixon is equally responsive to the averment of the petition that Martin Nixon and his estate since his death has continuously owned at least one-half of the capital stock of the corporation. As to this the respondent avers that on February 28, 1903, the date of the resolution of the board of directors voting him a salary, the trustees of the estate of Martin Nixon owned but 3,542 shares out of a total of 9,000 shares, which amount of stock is still held by them. It is true, indeed, that, in addition, the estate had at that time 1,626 other shares, at the present time 1,573 shares as collateral security for the payment by W. H. Nixon of the par value thereof from dividends

on his stock or otherwise.  But Article XXII of the agreement between Martin Nixon and W. H. Nixon, on which the petitioner relies, merely provides that said W. H. Nixon, as an officer of the company, shall not be entitled to receive any salary "so long as the said Martin Nixon shall continue to own in his own right one-half of the capital stock of said company."  The respondent claims that this was intended to apply during the life of Martin Nixon.  Without going so far as the respondent claims, and admitting that the provision is effective in favor of the estate of Martin Nixon, it is quite clear that when W. H. Nixon, for the first time in 1903, received a salary as president, the estate of Martin Nixon was not the owner of one-half of the capital stock in his own right, and it is evident from a perusal of the articles of agreement that these words, "in his own right," were expressly intended to exclude from the computation those shares which Martin Nixon (or his estate) held as collateral security.

We conclude, therefore, that W. H. Nixon, when he received his salary as president under the authority of a resolution of the board, was not prohibited therefrom by the terms of his agreement with Martin Nixon, and, therefore, the petition for review should be dismissed for want of equity.

The court made an order dismissing the petition.  Petitioner appealed.

*Error assigned* was the action of the court in dismissing the petition.

*Edward B. Martin*, with him *McCully & Hawkes*, for appellant.—A bill of review is the proper method of reopening an account: Downing's Estate, 5 Watts 90; Kinter's Appeal, 62 Pa. 318; Adams's Estate, 183 Pa. 134.

As long as the rights of third parties have not intervened, reviews are granted with liberality: Justice's Estate, 33 Pa. C. C. R. 61.

*Theodore F. Jenkins,* for appellee.—A bill of review will only be granted in case of error of law, apparent on the face of the record, or where new matter has arisen since the decree, or as a matter of grace on discovery of new proof: Hartman's App., 36 Pa. 70; Yeager's App., 34 Pa. 173; Russell's App., 34 Pa. 258; Green's App., 59 Pa. 235; Cramp's App., 81 Pa. 90; Milligan's App., 82 Pa. 389; LeMoyne's App., 104 Pa. 321; Scott's App., 112 Pa. 427; Priestley's App., 127 Pa. 420; Bailey's Est., 208 Pa. 594; Dox's Est., 227 Pa. 606.

PER CURIAM, February 3, 1913:

The decree of the Orphans' Court dismissing the petition for a review is affirmed on the opinion of Judge GEST.