Comerford Estate.

Argued January 16, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, JONES and COHEN, JJ.

*Paul A. McGlone,* with him *John T. J. Brennan,* for appellant.

*Edward W. Warren,* with him *Thomas F. Friday, J. Charles Hanahue,* and *Warren, Hill, Henkelman & McMenamin,* for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March 25, 1957:

This is an appeal from a final order of the Orphans' Court of Lackawanna County refusing to permit the opening and review of an account[1] in this decedent's estate.

M. E. Comerford died, testate, on February 1, 1939. Three provisions of his will are relevant to this appeal: a provision creating a trust in stock of a Delaware corporation known as Penncom Corporation, a provision disposing of his residuary estate and a provision appointing two executors.

---

[1] While the account is not so captioned, the account is treated as a partial account.

Item 7 of the will created a trust of which the entire res was such capital stock of Penncom Corporation (hereinafter called Penncom) decedent owned, either in his own right or as trustee, at the time of his death; two nephews, Frank C. Walker and M. B. Comerford, were named the trustees.[2]  Decedent disposed of the remainder of his estate as follows: (1) to Margaret Comerford, his widow, a 1/3rd interest; (2) to Mariel Comerford, a niece, a 1/9th interest; (3) to six nieces and nephews, children of a deceased sister, Ellen Walker, a 1/9th interest; (4) to six nieces and nephews, children of a deceased brother, Patrick Comerford, a 1/9th interest; (5) to a brother, John Comerford, and a sister, Margaret Cary, each a 1/9th interest; (6) to five nieces and nephews, children of a deceased sister, Mary Collins, a 1/9th interest.  Two nephews, Frank C. Walker and M. B. Comerford, were named as executors under the will.

Upon probate of decedent's will, letters testamentary were issued to the appellee, Frank C. Walker, his co-executor, M. B. Comerford, having predeceased the decedent.  Approximately one year later—January 31, 1940—an inventory was filed which listed assets valued at $1,739,771.32.

*No account was filed by the appellee until February 14, 1955—16 years after the grant of letters.*

---

[2] The trustees were authorized to hold this stock for a 15 year period during which the income was to be paid to decedent's residuary estate. During this period the trustees, in their discretion, could either sell the stock and distribute the proceeds, or distribute the stock in kind, to the estate. At the termination of the period the trustees were directed to dispose of the stock, either by a sale or a distribution in kind, and the proceeds of the sale or the stock itself was to be distributed to the residuary estate. In the event of the death prior to the termination of the trust of either of the named trustees, the power to appoint a successor trustee was given to the surviving trustee.

The appellee filed his first account on February 14, 1955 and this account was advertised for confirmation nisi on June 6, 1955 and final confirmation on June 17, 1955. After confirmation nisi of this account on June 6, 1955, the lower court permitted appellee to withdraw and amend the account and extended the date of final confirmation to September 22, 1955. The amended account—filed August 23, 1955—was confirmed nisi on September 12, 1955 and the time for final confirmation extended, at appellant's request, to October 31, 1955. In February 1956—due to a procedural change in the Orphans' Court Rules of Lackawanna County—notice was given by publication of the filing of this account and that it would be presented to the court for confirmation nisi on March 5, 1956 and, if no objections were filed by March 16, 1956, the account would be audited on March 20, 1956. The account was confirmed nisi on March 5, 1956 and presented for audit on March 20, 1956.[3]

On September 21, 1955, the five children of M. B. Comerford, a deceased nephew (holders of a 1/54th interest in decedent's estate), filed 41 exceptions to the appellee's account of August 23, 1955.[4]

These exceptions charged appellee with malfeasance, nonfeasance and misfeasance in his administration of this estate. These exceptions charged, inter alia: (1) that appellee, without authority, borrowed in excess of one and a half million dollars; (2) that appellee failed to include in the account all the assets and income of the estate; (3) that appellee over a 13

---

[3] Since the docket entries are confused we have taken the chronology of events from the appellee's brief.

[4] The docket entries indicate the same persons filed exceptions to the account of February 14, 1955. However, the printed record includes neither that account nor the exceptions thereto.

year period—up to 1952—improperly advanced to legatees (other than exceptants who received no advances) amounts in excess of $1,000,000; (4) that capital losses occurred in some of decedent's business ventures which were attributable to appellee's mismanagement of these ventures; (5) that the account shows a fictitious "credit due decedent" of approximately two and a half million dollars which was created by the alteration on or about March 15, 1955 of certain book entries and records;[5] (6) that appellee was dilatory in completing the administration of the estate and as a result thereof the estate was subjected to large interest and penalty payments on estate and inheritance taxes and excessive income taxes; (7) that appellee failed to convert securities, particularly so-called non-legal securities, with a resultant loss to the estate; (8) that appellee commingled estate funds with funds of certain individuals, other estates and corporations; (9) that appellee violated the rule against "self-dealing" in his administration of the estate; (10) that in the account of February 14, 1955 appellee set forth that the estate had liabilities in excess of one and one-half million dollars, whereas in this account all liabilities have been eliminated; (11) that appellee, together with one J. J. O'Leary, acting in fiduciary capacities, engaged in borrowing from certain accounts for the purpose of concealing corporate earnings, facilitating unequal distributions in this and two other estates, postponing settlement of these estates and maintaining complete control over the various Comerford corporations.

On December 15, 1955, with the lower court's ap-

---

[5] Exceptants claimed this credit was not listed in the inventory, on any tax schedules or in appellee's account of February 14, 1955.

proval, these exceptions were withdrawn and the account confirmed finally on the same date.[6]

At the audit of the account—March 20, 1956—appellant (holder of a 1/54th interest) petitioned the court to open and review the account for reasons referred to infra. After hearing, the court refused to open and review the account. Exceptions having been taken to this order, appellant then petitioned the court for a rule to take testimony in support of her exceptions. On August 24, 1956 the court confirmed the audit, dismissed the exceptions, discharged the rule to take testimony and refused to open and review the account. From that order this appeal was taken.

Appellant's request to open and review the account had a two-fold purpose: (1) to determine whether decedent at the time of his death owned any Penncom stock and (2) to determine whether the executor had unlawfully and improperly used an estate asset—1,000 shares of Penn State Realty, Inc. stock—to secure a personal advantage, i.e. the withdrawal of the exceptions charging him with mismanagement of the estate.

PENNCOM STOCK

Appellee's position is that at the time of death decedent did not own, either individually or as a trustee, any Penncom stock, in that decedent had divested himself of any ownership therein prior to his death. Appellee points out that Penncom stock is listed neither in the inventory nor the account and that the only reference thereto appears in a note in the petition for distribution: "M. E. Comerford, decedent, divested himself of all stock in the Penn Com Corporation previous to his demise, and therefore Item 7 of his Will became inoperative."

___

[6] Docket entry reads as follows: "Now, December 15, 1955, Confirmed finally as per Stipulation filed."

However, the record indicates that on January 13, 1951—approximately 12 years after decedent's death and approximately 11 years subsequent to filing his inventory—appellee, acting in the capacity of a trustee under Item 7 of the will, caused to be filed in the Register of Wills' Office in Lackawanna County an appointment of one J. J. O'Leary as successor-trustee to M. B. Comerford. This order of appointment recited that Frank C. Walker, appellee, *in pursuance of the power vested in him under Item 7 of decedent's will,* appointed J. J. O'Leary as a successor-trustee to take the place of M. B. Comerford, deceased. It is to be noted that Item 7 of the will deals entirely and exclusively with Penncom stock, the only duties of the trustees named therein would be in connection with Penncom stock and without Penncom stock the trust would be inoperative.

It is sophistic for the amicus curiae to argue, as she does in her brief: "Note that M. E. Comerford did not state that he owned any Penncom stock when he drew his will in 1934. He did not state that any stood in his name as Trustee." It is inconceivable that decedent, preparing for the disposition of his wordly assets, would create a trust, name trustees and set forth in detail the terms of the trust if he did not then own, either as an individual or as a trustee, the stock which was to be the *entire res* of the trust. This statement of the amicus curiae is at variance with appellee's position that decedent did own but had divested himself of ownership in this stock.

The order of appointment, in itself, raises a serious doubt concerning the validity of appellee's position with respect to the Penncom stock. If decedent did not own, directly or indirectly, any Penncom stock when he died,—appellee, as excutor, was bound to ascertain such fact—and, if appellee did conclude that decedent

had divested himself of ownership of this stock, why then did the appellee 12 years later appoint a co-trustee under Item 7 of the will? Why did appellee appoint a co-trustee to hold stock which he now says he *always* knew decedent did not own when he died? We cannot assume the reason for appellee's action in making this appointment; we only know that, superficially at least, appellee's action in making this appointment appears inconsistent with his present position. All that appellant requests is an explanation for this apparent inconsistency.

On July 2, 1956—5 months after appellee filed the first account and 6 weeks prior to the last account—articles of merger were filed with the Department of State of this Commonwealth merging 36 so-called "Comerford Corporations" into the Meco Realty Company. The articles of merger recited, inter alia, that: (1) Penncom was a holding company which owned 100% of the stock of the Comerford Publix Corporation, Comerford Publix Theatres Corporation and Midas Theatres Corporation; (2) that 21 named corporations owned 100% of the stock of Penncom; (3) "all of the stock of the above named companies (including the 21 companies owning 100% of the stock of Penncom Corporation) is owned, directly or indirectly, in the following proportions: *One-third by the Estate of M. E. Comerford;* one-third by Frank C. Walker and one-third by Penn State Realty, Inc. The ownership before and after the merger will be identical." (That which appears in parenthesis, together with emphasis, is supplied). Appellee set forth under oath that these statements were true and correct. After the argument before this court, appellee, in a supplementary written statement, explained that the estate of M. E. Comerford, Frank C. Walker and Penn State Realty, Inc., each owned one-third of Penncom indi-

rectly, in that they each owned one-third of the corporate stock of certain corporations which in turn "own 100% of the stock of Penncom Corporation."

This statement in the articles of merger, even when considered with appellee's written explanation, increases the orbit of doubt and uncertainty whether decedent had divested himself of ownership of Penncom stock during his lifetime. Coupled with O'Leary's appointment as trustee, this statement furnishes a reasonable basis to justify an inquiry when and under what circumstances decedent ceased being the owner of this stock. If the appellee did not come into possession of this stock by reason of the fact that decedent had divested himself of ownership therein prior to his death, what possible harm to appellee can result from a disclosure of the facts of such divestiture? On the other hand, the doubt which now arises would be dissipated by a complete revelation of the facts.

The learned judge dismissed appellant's request to reopen and review this account in this respect upon two grounds: first, that appellant's request was not made timely and, second, that any stock held by anyone as trustee was outside the scope of appellee's accounting.

In *Stotesbury Estate,* 387 Pa. 591, 594, 128 A. 2d 587, Mr. Chief Justice Jones, speaking for this court, stated: "The right of any party in interest to a review of a fiduciary's account, auditor's report, adjudication or decree of distribution within five years after the final confirmation of the account is clear where the petitioner specifically sets forth the errors therein, that right and justice require the granting of the relief sought and that none of the property involved has been distributed by the personal representative in accordance with a decree of court before the filing of the petition: Section 721 of the Fiduciaries Act of 1949, P. L.

512, 20 PS §320.721". In that case this court reversed the lower court's refusal of a petition to review filed 2 years and 4 months after confirmation of the account.

Appellee, in his brief, argues that October 31, 1955 was "the last day, the cut-off date, for appellant to file exceptions and the Account was confirmed finally as to appellant at that time." On the other hand, the record shows that exceptions to the account, supra, were then pending and remained undisposed of until December 15, 1955; further, the notice by publication of this account stated that if no objections were filed by March 16, 1956 the account would be audited on March 20, 1956. If appellee's argument be sound, then there was one time limit applicable to appellant and another time limit applicable to others, a result the injustice of which is self-evident. The fact is that the petition for distribution for the first time disclosed appellee's position that decedent had divested himself of the stock prior to his death and that petition was not filed until the audit on March 20, 1956. On the same day, at audit, appellant raised this question before the lower court and six days thereafter filed a formal answer to the petition for distribution formally raising the question. Not only was the appellant's objection timely, but it was made when appellee first disclosed his position concerning the Penncom stock. Cf. *Stotesbury Estate,* supra, p. 595: "That the petitioners did not raise the question at the time of the audit and confirmation of the account or upon the entry of the adjudication is not valid ground for denying the petitioners the desired relief."

Appellant does not seek to require appellee to account for the actions of anyone as trustee. On the contrary, all that appellant requests is a judicial inquiry to determine whether at the time of his death

decedent had any right of ownership in Penncom stock. To this inquiry appellant is clearly entitled.

The amicus curiae relies on *Crisswell's Estate,* 334 Pa. 266, 269, 5 A. 2d 577. The ruling in that case was that an Orphans' Court was without power to determine the title or ownership of assets which were not in the possession of a decedent at the time of his death and did not come into the possession of the executors. The Orphans' Court Act of 1951, as amended, vests jurisdiction in the Orphans' Court to adjudicate the title to personal property not only where it is in the personal representative's possession but also where it is registered in the name of decedent or his nominee, or alleged by the personal representative to have been in decedent's possession at the time of his death.[7] Our inquiry is whether appellant has the right to ascertain whether the personalty was in decedent's possession or registered in his name or that of a nominee when he died. After the facts are ascertained, if neither condition is shown to exist, then the Orphans' Court would be without jurisdiction; however, until the facts are ascertained by a proper inquiry, the jurisdictional question remains unanswered. *Crisswell's Estate,* is clearly inapposite.

The learned court below erred in not permitting appellant to pursue an inquiry into the entire question of decedent's ownership of the Penncom stock.

PENN STATE REALTY, INC. STOCK

Appellee's inventory listed 1,000 shares of stock of Penn State Realty Company (a Delaware Corporation) valued at $386,860.00. Appellee's account—filed August 23, 1955—listed 1,000 shares of stock of Penn

---

[7] Act of Aug. 10, 1951, P. L. 1163, Art. III, §301, as amended by Act of Aug. 4, 1955, P. L. 302, No. 116, §1 and Act of Feb. 10, 1956, P. L. 1022, §3, 20 PS Supp. §2080.301 (13).

State Realty Company valued at $275,188.72. An examination of the income account indicates that the estate received from this stock over the 16 year period —from the time of decedent's death—$414,650 as income or an average of approximately $26,000 a year. This asset was the third most valuable in the estate and produced more income than any other asset.

After M. B. Comerford's children filed exceptions to the account on September 21, 1955 the docket entries indicate no further step was taken until December 15, 1955 when a stipulation or agreement was filed in court.

It is on the basis of this stipulation that appellant seeks a review of the account to determine whether appellee used this valuable estate asset for his own personal advantage. In analyzing the terms of this stipulation a certain factual background must be kept in mind: (1) it was not until *after* appellee was charged with misfeasance and malfeasance in the management of this estate that the stipulation arose; (2) for upwards of 16 years no distribution of any of the assets had taken place; (3) within two weeks after approval of the stipulation, distribution in kind of the Penn State Realty, Inc. stock was made without the benefit of a court order; (4) Penn State Realty, Inc. was a closed corporation the beneficial interests whereof were owned entirely by relatives of appellee; (5) two of the three directors of the Penn State Realty, Inc. were appellee and J. J. O'Leary, both of whom had been charged with mismanagement as fiduciaries in the several estates, and the third director was one of their attorneys.

An examination of the stipulation reveals, by way of preface, certain recitals to the effect that exceptions were filed not only in this estate but in two other estates—the estates of M. B. and Anna D. Comerford

wherein appellee and J. J. O'Leary were co-fiduciaries, that conferences had been held for the purpose of effecting a withdrawal of these exceptions and that the exceptants were now willing to sell their stock in the M. B. and Anna D. Comerford estates. *This stipulation is not an agreement between the exceptants and Frank C. Walker and J. J. O'Leary in their individual capacities*: on the contrary, *the stipulation is between the exceptants and Frank C. Walker and J. J. O'Leary as "accountants", that is, in their fiduciary capacities.*[8]

This stipulation provided that $1,000,000 was to be paid to the exceptants, not by appellee and O'Leary as individuals, but by appellee and O'Leary as "accountants" (i.e., in their fiduciary capacities), or "their nominee". The "quid pro quo" for the payment of the sum of $1,000,000 and that for which appellee and O'Leary bargained under this stipulation is fivefold: (1) a sale by exceptants to a "nominee of Frank C. Walker" of all their interest in this estate;[9] (2) a purchase of exceptants' total interest in certain securi-

---

[8] Query: If the statement of amicus curiae's counsel to the court below that appellee had "an option for the purchase of a 1/3rd interest in 27 corporations" and that he obtained this option by virtue of this stipulation be correct, then under the stipulation appellee obtained the option not in his individual but rather in his fiduciary capacity. Present counsel for amicus curiae appeared as one of appellee's counsel in the court below.

[9] The use of the phrase "nominee of Frank C. Walker" poses several interesting questions. Why was that phrase used in connection with the sale of exceptants' interest in this estate and the phrase "a designated corporation" used in connection with the sale of exceptants' securities in the other two estates? Was the nominee that of appellee in his individual or fiduciary capacity? Why was the nominee to be appellee's nominee in Paragraph 2 of the stipulation and the nominee under Paragraphs 6 and 8 to be appellee's and O'Leary's nominee?

ties of the M. B. Comerford estate;[10] (3) a purchase
of exceptants' total interest in certain securities of the
Anna D. Comerford estate;[10] (4) a general release of
the fiduciaries from any liability in all three estates,
and (5) a withdrawal of exceptions in all three es-
tates. This stipulation effected a purchase by O'Leary
and the appellee, in their fiduciary capacities, not only
of the securities in the two estates other than this es-
tate, but also of the withdrawal of charges which ex-
ceptants had made concerning the fiduciaries which,
if proven, could well have been the basis of extensive
personal surcharges. Thus, on record, we have an
agreement under which the appellee, in his fiduciary
capacity in this estate, and, acting with O'Leary in
their fiduciary capacities in the other two estates, will
pay $1,000,000 to exceptants, part of the considera-
tion for which is the exoneration of appellee and
O'Leary from the charges contained in the exceptions.

To raise the million dollars necessary to carry out
the terms of the stipulation appellee and O'Leary em-
ployed a corporate device. Since the appellee had filed
his account, and since by the withdrawal of exceptions
the way would be cleared for an early audit of the
account, the appellee could anticipate the decree of
distribution by a distribution in kind in advance of
audit without any order of court.[11] Appellee distrib-
uted all the Penn Realty stock to the residuary lega-

---

[10] While the Record lists these securities, no value thereof is
given. 23 of the companies listed in Schedule A of the stipulation
and 22 of the companies listed on Schedule B of the stipulation
(Rec. 91a, 92a, 93a) appear approximately 6 months later in the
articles of merger as owned, directly or indirectly, 1/3 by this es-
tate, 1/3 by Penn State Realty, Inc. and 1/3 by appellee. Query:
Did appellee own a 1/3 interest on the date of stipulation?

[11] This distribution in kind was at appellee's risk: Fiduciaries
Act of 1949, P. L. 512, §734, 20 PS 320: *Free's Estate*, 327 Pa. 362,
194 A. 492.

tees. Prior to such distribution, appellee, O'Leary and one Thomas Friday, as directors of the corporation, voted to purchase from exceptants their stock in the other two estates. After distribution of the stock, at an annual meeting of the stockholders the directors' action was ratified, the stock was purchased and the exceptants received $1,000,000. Appellant was unaware of the transaction until it was an accomplished fact.

It is the appellee's position that the device employed was perfectly proper and any inquiry into or interference with such device was beyond the jurisdiction of an Orphans' Court. It is true, as appellee urges, that the Orphans' Court has no jurisdiction to regulate the internal affairs of a corporation even though the decedent owned shares of stock in that corporation: *Goetz's Estate (No. 1)*, 236 Pa. 630, 85 A. 65; *Nixon's Estate*, 239 Pa. 270, 86 A. 849; *Watson's Estate*, 314 Pa. 179, 170 A. 254. The error of the learned court below is clear. Neither the lower court nor this court is called upon in this proceeding to determine the regularity or propriety of the corporate action. On the contrary we are called upon to determine whether appellant has the right to inquire into the propriety and regularity of appellee's action as the fiduciary of this estate. Did the appellee use his office as a fiduciary to secure for himself a personal financial advantage?

To entitle appellant to open and review the account a reason must exist to justify such a request. The instant record clearly evidences such a reason. Appellee was charged in the exceptions to his account with malfeasance, nonfeasance and misfeasance which, if proven, could well have subjected him to a very extensive personal surcharge. While under the shadow of these charges—whether they could have been sustained or not—appellee undertook with O'Leary (his

co-fiduciary in two other estates in which both he and O'Leary were also under attack by the same persons) to enter into an agreement with the persons who had made these charges. Appellee and O'Leary, acting not as individuals but in their fiduciary capacities as "accountants" in the three estates, agreed to pay those who had made the charges the sum of $1,000,000, not only for the stock in two estates, but also for the withdrawal of the charges which they made against appellee and O'Leary. Appellee, O'Leary and one Thomas F. Friday,[12] as directors of Penn State Realty Company, voted to have that corporation put up the $1,-000,000 on the theory that that corporation was effecting a purchase of the stock held in various corporations by the M. B. and Anna D. Comerford estates. Appellee then distributed the Penn State Realty stock to the legatees in this estate—*the first and only distribution of any asset of this estate in 16 years.* The corporation's stockholders—most, if not all, of whom are appellee's relatives—voted to ratify the action of the directors. The sale was effected, the corporation received the stock in the various corporations held by the M. B. and Anna D. Comerford estates, *and* appellee and O'Leary received a complete release and clearance of any and all the charges made by exceptants concerning their management of this and the other two estates. Under these circumstances, appellant, as the holder of an interest in this estate—no matter how comparatively infinitesimal it may be—clearly has the right to reopen and review this account that the propriety of the appellee's actions might be inquired into and ascertained.

In *Meinhard v. Salmon et al.,* 249 N. Y. 458, 164 N. E. 545, the late Mr. Justice CARDOZO said: "A trus-

---

[12] Friday signed the stipulation as one of counsel for appellee and O'Leary.

tee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Wendt v. Fisher, 243 N. Y. 439, 444, 154 N. E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

Mr. Justice BELL, speaking for this court, in *Steele Estate*, 377 Pa. 250, 257, 103 A. 2d 409, stated: "The general principle is well settled that a trustee is under a duty to the trust estate and the beneficiaries thereof to administer the trust solely in their interests, and he may not profit at the expense of the trust estate or the beneficiaries thereof: Flagg Estate, 365 Pa. 82, 73 A. 2d 411; Union Real Estate Investment Co. Case, 331 Pa. 569, 1 A. 2d 662; Restatement, Trusts, §170(1); Noonan Estate, 361 Pa. 26, 31, 63 A. 2d 80."

Mr. Chief Justice JONES in *Noonan Estate,* supra, pp. 30, 31, 32, 33, excellently outlined an executor's duty of loyalty: "An executor is a fiduciary no less than is a trustee (Restatement, Trusts, §6, Comment i.) and, as such, primarily owes a duty of loyalty to a beneficiary of his trust: Restatement, Trusts, §170(1). Under Comment p. of the latter section of the Restatement, the rule is given presently pertinent specification in the following language: "The trustee is under a duty to the beneficiary in administering the trust not to be guided by the interest of any third person. Thus, it is improper for the trustee to sell trust property to a third person for the purpose of

benefiting the third person rather than the trust estate.' . . . 'He that is intrusted with the interest of others, cannot be allowed to make the business an object of interest to himself; because, from the frailty of nature, one who has the power, will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of those for whom he is intrusted': Beeson v. Beeson, 9 Pa. 279, 284.

"The executor was, moreover, guilty of self-dealing, as the circumstances attending the sale disclose. Such a transgression does not lie exclusively in a fiduciary's sale of trust property to *himself*. Cf. Downing Estate, 162 Pa. Superior Ct. 354, 57 A. 2d 710, affirmed *per curiam* by this Court: 359 Pa. 534, 535, 59 A. 2d 903. The test of forbidden self-dealing is whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it *might* have affected his judgment in material connection: Downing Estate, supra, at p. 359, citing Scott on Trusts, Vol. 2, §170.12, p. 877, and Restatement, Trusts, §170 (1), Comment h. See also Comment c. of the same section of the Restatement which declares that 'The trustee violates his duty to the beneficiary not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale.' It will be noted that the extent of the fiduciary's disqualifying interest need not be such as 'did affect his judgment' but merely such as 'might affect his judgment': Downing Estate, supra, at p. 360.

. . .

". . . in Chorpenning's Appeal, 32 Pa. 315, 316, it was said that '. . . the rule [forbidding self-dealing] is inflexible, without regard to the consideration paid, or the honesty of intent. Public policy requires this,

not only as a shield to the parties represented, but as a guard against temptation on part of the representative.' In Downing Estate, supra, President Judge RHODES of the Superior Court succinctly summarized the rule at p. 360 as follows: 'The prohibition against self-dealing is absolute; where the trustee violates it, good faith or payment of a fair consideration is not material.' See also Restatement, Trusts, §170 (1), Comment h."

Appellant does not at this stage charge that the appellee was guilty of impropriety of conduct as the executor of this estate; she simply requests the right to reopen this account and review appellee's actions in order that the court might determine the propriety of appellee's conduct. The record justifies granting her request.

That the withdrawal of the charges made against appellee was a part of the bargain whereby one million dollars was paid to those who made the charges raises the question of self-dealing on the part of an executor. That appellee in his fiduciary capacity entered into an agreement whereby all the exceptants' interest in this estate was sold to a "nominee" to be designated by him raises the question of his right to delegate his fiduciary duties to another as well as the right of a fiduciary to acquire an interest of a legatee through a purchase of the legatee's rights. That the appellee, by his use of the corporate device, followed by his distribution of the stock without court order, was in substance effecting a purchase of exceptants' interest in a group of corporations in which he, as an individual, held a substantial interest raises the question whether appellee can do indirectly that which he could not do directly, i.e. effect a purchase as fiduciary of securities in a corporation in which he is a substantial stockholder. These and other questions which arise

from the record require that appellant be granted the right to inquire into the entire transaction involving the stock of the Penn State Realty, Inc.

We are not in this proceeding passing upon the question of the propriety or impropriety of the appellee's conduct. To grant appellant's petition to open and review this account is not an adjudication that appellee has been guilty of any misconduct whatsoever in connection with this estate; it simply means that the inculpatory, and, if need be, the exculpatory, shall be heard and considered. *Kuhns's Appeal*, 87 Pa. 100, 104.

Even though this is a partial accounting it is final with regard to all that it contains: *Rhoad's Appeal*, 3 Wright, 186; *Shindel's Appeal*, 57 Pa. 43; *McLellan's Appeal*, 76 Pa. 231; *Schaeffer's Appeal*, 119 Pa. 640; *Galloway's Estate*, 5 Pa. Superior Ct. 272. Since appellee raised in his petition for distribution the question of decedent's ownership of Penncom stock, and, since the distribution of the Penn Realty stock was presented to the court for ratification and approval, appellant was well within her rights in raising these questions in connection with this account.

The order of the court below is reversed and costs of this appeal are placed on the estate.