John B. UPP, et al.

v.

MELLON BANK, N.A.

Civ. A. No. 91–5219.

United States District Court,
E.D. Pennsylvania.

Aug. 7, 1992.

C. Oliver Burt, III, Greenfield & Chimicles, Haverford, Pa., for plaintiffs.

Thomas McGough, Jr., Reed Smith Shaw & McClay, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, District Judge.

FINDINGS OF FACT:

Defendant Mellon Bank, N.A. ("Mellon" or the "Bank") is the successor-in-interest to named defendant Mellon Bank (East), N.A., and to Girard Trust Corn Exchange Bank, later named Girard Trust Bank ("Girard"), which Mellon acquired.

Mellon is a banking association organized under the laws of the United States with its head office in Greensburg, Westmoreland County, Pennsylvania and its executive offices in Pittsburgh, Pennsylvania.

Mellon maintains banking offices in this District, including offices at Mellon Bank Center, 1755 Market Street, Philadelphia, Pennsylvania.

Mellon conducts bank trust operations in the Commonwealth of Pennsylvania.

Beginning in mid–1990, Mellon consolidated the charters of Mellon Bank (East), N.A., Mellon Bank (North), N.A., Commonwealth National Bank, and Mellon Bank (Central), N.A. into the single charter of Mellon Bank, N.A.

Plaintiff John B. Upp, a citizen of the State of Maryland, is a beneficiary of three trusts for which Girard was the original trustee and for which Mellon is now the successor trustee.

Plaintiff is an income beneficiary on certain trusts set up by his grandmother and mother. Plaintiff's mother and grandmother appointed Mellon's predecessor, Girard Bank, as trustee to administer and manage the principal and income of the trusts.

Mr. Upp is the beneficiary of three trust accounts managed by Mellon that have been charged sweep fees. Since 1981, Mr. Upp's accounts have been charged sweep fees of approximately $4,012.14.

In January, 1981, Girard became the first bank in Pennsylvania to provide its trust customers with the opportunity to earn a return through the daily temporary investment of idle cash.

Girard inaugurated an automated system for short-term investment of cash in trust accounts, known as sweeping, on January 1, 1981 for substantially all of its trust accounts.

From the beginning, Girard swept both principal and income cash balances.

Girard was the first bank in Pennsylvania to have a cash sweep system and to charge sweep fees to its trust customers.

When Girard began its cash sweep in 1981, it charged 37 and 1/2 basis points, or $0.375 for every $100 invested in these sweep investments, on an annual basis.

In 1981–82 in Pittsburgh, Mellon designed and developed a system and procedure for the daily temporary investment of idle cash, which was implemented in January, 1983.

In 1984, the Pennsylvania Legislature amended the Estates and Fiduciaries Code 20 Pa.C.S. § 7315.1(b), to permit a fiduciary to "make temporary investment of funds" in short term deposits or investments for which the fiduciary may "make a reasonable charge, in addition to all other compensation to which he is entitled ...". The

amended statute became effective October 12, 1984.

The parties have agreed that the rate of Mellon's sweep fee has been 50 basis points since 1985. That is, if $100 was temporarily invested by Mellon every day for one year, the total charge for the entire year for the temporary investment services would be 50 cents.

Mellon changed the sweep system in 1985 so that swept cash from one Mellon bank affiliate (such as Mellon (East)) could be deposited automatically in another, separately chartered Mellon bank affiliate (such as Mellon (Delaware)), a process which enabled Mellon to obtain the maximum FDIC insurance coverage of $100,000 on the deposits in each bank. By 1986, Mellon had four affiliate banks participating in the cash sweep, and the sweep system could accommodate amounts of up to $400,000 with FDIC insurance coverage.

Mellon ended the multi-bank sweep system in 1990 when it consolidated the charters of several bank affiliates into Mellon's charter.

When Girard instituted sweeping in 1981, and Mellon began sweeping income cash in January, 1983, and principal cash from some accounts in September, 1983, both banks sent a letter to trust customers informing them of the new service and, in general terms, the fee charged for it.

Girard sent periodic account statements to trust customers, and the sweep fee, described in general terms, was included in "stuffers" included each time the statements were mailed.

None of this generalized information about sweep fees conveyed the application of the fees to particular accounts in meaningful terms.

■ Defendant Mellon charges a fee to its trust customers for combining relatively small amounts in various trust funds, which would otherwise be idle, and then investing the aggregate amount. This practice is known as "sweeping," hence the fee is called a "sweep fee." In so doing, the bank is charging an excessive fee for the service. The bank charges a standard fee for managing the trust funds and then "double dips" to charge an unreasonable sweep fee for its services. It is as if Mellon charged a fee for managing the trust funds and then charged separate exorbitant fees for writing letters, making telephone calls, and the other mechanics of investing the trust funds. Mellon knows it is "double dipping" and intends to do so to meet revenue goals. The sweep fees are far out of proportion to a reasonable charge for that service. In short, by charging excessive sweep fees, Mellon is simply feathering its own nest at the expense of funds it holds in trust.

Mellon's Trust and Investment Department ("TID") assesses an annual management fee, expressed in Mellon's fee schedules as a base fee plus a fee based upon the amount of assets managed. This fee is a reasonable charge for the bank's services. The sweep fee is an additional charge on that portion of the trust funds that have daily availability and are "swept." This fee is an excessive charge for the sweeping services. In accounts administered by TID, the assets on which Mellon charges a sweep fee are also included in the assets on which it charges a management fee. In those accounts, the sweep fee is unfair, duplicative, and an overcharge.

The operating margin associated with the sweeping function is far out of proportion to the operating margins associated with other services Mellon provides. Sweeping generated well over $7,000,000 in revenue for 1991. The costs of developing and enhancing the computer system never exceeded $100,000 in any year, although Mellon does not have a practice of tracking and allocating such costs. Consequently, the operating margin for sweeping was over 7,000%.

Although not determinative of the point in issue, but by way of comparison, TID's overall 1991 operating margin was approximately 45% on total revenues of approximately $300,000,000. Mellon's overall profit margin for 1991 before taxes and extraordinary gains was slightly below 10% and that figure net of total TID service fees was about 6%.

In late 1981, the Office of the Comptroller of the Currency took the position that national banks holding funds as fiduciaries must generally invest those funds in income-earning accounts. In 1982, a regulation to that effect was promulgated.

In 1982, one of the developers of the computer system used by Mellon to execute the sweeping procedure, estimated that the direct cost of developing the system would be $73,463.50. Plaintiffs' Exhibit 28. There was even a lower estimate of $58,277.50. Plaintiffs' Exhibit 65.

The largest continuing "cost" listed in that developer's report was lost revenue of $3,000,000. Plaintiffs' Exhibit 90. There was also a cost benefit "loss" of $9,488,705 estimated over five years. Plaintiffs' Exhibit 28. This was an estimate of the "loss" of interest Mellon would suffer compared to what it previously had earned and retained on the idle funds. This is hardly a "cost" since the interest belonged to the trusts, not to Mellon.

The head of TID, categorized computerized sweeping as a function of the trust accounting system rather than as a separate product or service. The bank does not allocate any costs to the cash sweep system and has never done so. Mellon employees testified that in addition to automatic computer functions, there are costs for manual services that must be performed as part of the sweeping process, but they were unable to estimate what those costs might be. No one at Mellon has ever tried to determine the total amount of sweep fee expenses or make an analysis relating sweep fee revenues to expenses. In any case, such costs and expenses would be nominal.

The original plan for sweeping included no fee for the act of sweeping. Rather, the cost of the procedure was to be incorporated into the next revision of the TID Pricing Schedule. On Oct. 13, 1982, the Trust Pricing Committee adopted a policy pursuant to which an annualized fee of $0.30 per $100 of cash invested would be established for sweeping income in Personal Financial Services Division accounts. In 1983, the bank started to sweep income in trust and fiduciary accounts and to charge the fee of $0.30 per $100 of cash invested as part of a new, higher schedule of fees. The letter informing TID customers of the new fees stated that the sweeping procedure created a new benefit for them which justified the new fees.

On Sept. 1, 1983, Mellon began sweeping cash from principal balances on directed trust and custody accounts. Six days later, the Trust Pricing Committee approved a fee of $0.30 per $100 of cash invested for doing so. Again, a letter to customers informed them in general terms of the fees, but Mellon did not reflect the application of the fees to customers' accounts in meaningful terms which would communicate the extra charges so that they could be understood by the average customer.

At approximately the time that the bank started sweeping funds from principal, it also effected an annualized internal charge of $0.15 per $100 of funds swept, a charge which remains in place up to the present. This additional fee is compensation allocated by the bank's financial side to TID for the use of swept funds. Customers do not pay the $0.15 fee "directly." Rather, the charge allocated to the financial side is reduced by that amount.

In 1985, the bank increased its standard sweep fee for income cash from all accounts, and for principal cash from directed trust accounts and custody accounts, to $0.50 per $100 a year. A fee of the same amount was also imposed on all principal cash invested in any vehicle with daily liquidity, regardless of whether it was invested via the sweep system. Plaintiffs' Exhibit 85. These fees are still in effect.

As a result of fee negotiations, some accounts are charged lower management fees, which are reasonable.

■ Mellon did not inform personal trust customers, in meaningful terms, of the application of sweep fees charged to particular accounts until 1986. Previously, it reported only the net amount of interest earned from the sweep. Mellon concealed the excessive sweep fees before 1986 by reporting only the net interest earned from the sweep. Advising beneficiaries general-

ly of the sweep fees hardly justified misleading them by netting out the fees on their statements. The present method of disclosure, not adopted until March, 1986, involves a notation that describes the sweep interest posting, including a separately stated sweep fee, but does not make a line item disclosure, the way the bank posts other fees.

Mellon recognized that it could not charge sweep fees on the ERISA accounts it managed after a Department of Labor audit and refunded those sweep fees to the ERISA accounts with interest.

In choosing where to invest swept funds, Mellon selected investment vehicles in which it had an interest and favored them over independently managed investment funds.

The total amount of sweep fees collected since 1981, including fees collected by Girard, is approximately $55,638,000 as follows:

| | |
|---|---|
| 1981 | $2,330,000 |
| 1982 | 2,032,000 |
| 1983 | 2,099,000 |
| 1984 | 2,995,000 |
| 1985 | 2,974,000 |
| 1986 | 4,899,000 |
| 1987 | 7,299,000 |
| 1988 | 8,028,000 |
| 1989 | 7,097,000 |
| 1990 | 7,984,000 |
| 1991 | 7,901,000 |
| | $55,638,000 |

Simply stated, Mellon charges its fiduciary accounts a management fee plus a "sweep fee" for depositing uninvested trust funds in interest bearing accounts. Mellon demonstrates no cost to itself for this "sweeping" service. The millions of dollars of sweep fees collected are profit. This profit is in addition to the highly profitable charges Mellon makes for administering its trust accounts. The original computer programs to accomplish this sweeping of idle funds cost less than $100,-000. The cost of sweeping is a de minimus offset to the millions of dollars of sweep fees collected each year. Before sweeping idle trust cash into investments, Mellon treated the idle trust funds as a kind of no interest Christmas Club trust account for

its own benefit. Sweeping provides a high sounding benefit to the trusts. It is nothing of the sort. It is no more a benefit than would be more mundane deposit of idle trust cash in a savings account. The simple computerized program to accomplish this is a benefit for the bank, because the sweeping operation is cheaper than a manual trust-by-trust deposit of idle cash into savings. There could be a reasonable fee for sweeping services in some cases, in some banks. In Mellon's case, the record shows no rational basis that the sweep fees charged are reasonable. The ongoing costs are close to zero on the record before me.

That a selected small sample of other banks or plaintiffs' expert's former employer charge sweep fees hardly justifies Mellon's practice. In any event, we do not know the other banks' costs or service for the fees, or whether the other banks' fees are reasonable.

Mellon clothes the sweeping service in a aura of complexity. It is a simple computer program.

The trust department is a significant profit center compared to Mellon's other operations. The sweep fee program is simply piling on more fees in that profit center to meet perceived revenue goals. It is an acknowledged "double dip" on the already profitable fees for managing trust accounts.

Before the computer age, it seems doubtful that Mellon could charge a reasonable fee for managing trust assets and then charge a "sweep" fee for sweeping otherwise idle cash, for example, into a savings account. There is no evidence that small deposits in savings accounts are traditionally rejected by banks. Nor is there evidence that banks traditionally charge for small savings deposits.

■ Surely, banks may charge reasonable sweep fees. This is not the issue. The issue is whether the sweep fees charged by this bank are unreasonable. I find that they are on the record before me.

■ Essentially, Mellon's sweep fee is arbitrary. Its charge does not take into account what the investment produces. To

claim that some other banks do it hardly measures a market value for the service. Defendant's expert's survey was not a persuasive survey of the market. Mellon was not meeting competition. It was taking advantage of a lack of competition. An irrevocable trust or even a revocable trust naming Mellon as trustee is in a rather inelastic demand position.

■ It begs the question to say that sweeping earned some benefits for the trust. Rather, the issue is whether Mellon deprived the trusts of a portion of the benefits to which they were entitled by charging an unreasonable fee for sweeping. Mellon had a fiduciary duty to invest idle cash. The sweeping was the most simple and economical way to satisfy Mellon's fiduciary responsibilities. The sweep fee was bad form, but it was Mellon's form. The sweep fee was bad substance on this record because there was no rational justification for it. One of Mellon's sophisticated managers suggested in his trial testimony that the notion of sweep fees was on its way out at least for some portion of the Bank's business. Simply to say it is a reasonable charge does not make it so.

With the greatest respect for the Orphans Court of Montgomery County, I must decide this matter on the record before me. On that record, I find Mellon's sweep fees unreasonable.

Sweeping is jargon for crediting trusts with income the Bank has earned with the trusts' money on deposit. One can imagine a reasonable charge for making such an appropriate bookkeeping entry on the trusts' accounts, but this is not it. Mellon has used its authority to charge a reasonable fee for the purpose of imposing an unreasonable one. The sweep fees, combined with Mellon's standard and specially negotiated fees, are unreasonable to the extent of the sweep fees.

■ Punitive damages are particularly appropriate here because Mellon's most significant rationale for charging sweep fees, i.e., the Bank was "losing" interest on trust funds which do not even belong to it, is outrageous. The bank's stated intention to "double dip" shows a bad motive for the charges. Punitive damages, awarded to the class representative who initiated the action, are an appropriate way to deter such conduct in the future. While the other members of the class have a colorable claim for such damages, such an award would be excessive.

CONCLUSIONS OF LAW:

This court has subject matter jurisdiction over this diversity action because the amount in controversy, exclusive of costs and interest, is in excess of $50,000. Punitive damages may be considered in determining whether the jurisdictional amount requirement has been satisfied. *Klepper v. First American Bank*, 916 F.2d 337, 341 (6th Cir.1990).

■ This court is not bound by the accounting in the Orphans Court regarding the reasonableness of the sweep fees. Under Pennsylvania law, the doctrine of collateral estoppel applies only if there has been a final judgment on the merits. *Schroeder v. Acceleration Life Ins. Co. of Pa.*, No. 91–3518, slip op., at 8, 972 F.2d 41, 45 (3d Cir. July 31, 1992). There is no such final judgment here, until state court appeals are exhausted. Mellon's lawyer suggested that he expected the Orphans Court to rule on pending exceptions momentarily. Plaintiffs' attorney has made clear his intention to appeal any adverse result in the Orphans Court.

For the reasons articulated in the court's Orders of May 29, 1992 and June 24, 1992, plaintiff class was properly certified. However, the court's Order of May 29, 1992, is modified as follows: The plaintiff class is limited to beneficiaries of trust accounts for which defendant charges a management fee of which defendant is trustee.

■ As a fiduciary, Mellon owes a duty of loyalty and candor to the trust beneficiaries: it must deal with them fairly, administering the trust funds solely in their interest, and disclose all facts that it knows or reasonably should know regarding all transactions involving their accounts.

*Comerford's Estate,* 388 Pa. 278, 130 A.2d 458 (1957).

█ Mellon's belated disclosure of the sweep fees in meaningful terms is a breach of its fiduciary duty of candor. Mellon also breached its fiduciary duty of loyalty by charging excessive sweep fees, in addition to its management fee.

█ Punitive damages may be recoverable from a self-dealing trustee. *Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951); *Schoenholtz v. Doniger,* 657 F.Supp. 899, 913–15 (S.D.N.Y.1987); *see also Dean Witter Reynolds, Inc. v. Genteel,* 346 Pa.Super. 336, 499 A.2d 637 (1985). The finder of fact has determined that there has been conduct which, in light of the circumstances, including the wrongdoer's motivation and its relationship to the aggrieved parties, is especially egregious. An award for punitive damages is appropriate to deter future overcharges to its trust accounts by Mellon.

## JUDGMENT

AND NOW, this 7th day of August, 1992, judgment is entered in favor of plaintiff, John B. Upp, and against defendant Mellon Bank, N.A. in the amount of $75,-000 for punitive damages. Defendant Mellon Bank, N.A. shall reimburse the trusts of which the members of plaintiff class are beneficiaries its sweep fees charged to those trusts plus the interest that would have been earned by the trusts on those sweep fees to the date of such reimbursement.

The enforcement of the second sentence of this judgment is stayed during the period after its entry and while a timely appeal is taken and during the pendency of the appeal.