**Shewchuk Estate**

Before Klein, Adm. J., Bolger, Lefever, Saylor, Shoyer and Silverstein, JJ.

## ADJUDICATION SUR AMENDED PETITION, ANSWERS AND REPLIES

LEFEVER, J., July 8, 1970.—Decedent, John Shewchuk, was born on October 1, 1887, in Kolomja, Galicia, Austria. He emigrated to the United States on the vessel Brandenburg, arriving in New York City on

January 3, 1906. Because of the difficulty of the pronunciation and spelling of his name, he sometimes used the name of John Smith and was called John Shaw and John Schow by his employers, Freihofer Baking Company and Electric Storage Battery Company, respectively. However, his name was never legally changed from John Shewchuk.

Early in 1909, he entered into a meretricious relationship with Pauline Rogowska, who was born in 1891 in Eastern Europe.[1] Both of them spoke the Ukrainian language. On December 4, 1909, a daughter, Mary, was born of this meretricious relationship. Pauline was delivered by a midwife, Mary Rajca, who resided at 2233 Callowhill Street, Philadelphia. Shortly thereafter, Pauline had decedent arrested on charges in connection with the conception and birth of this child. He was subsequently released upon his promise to marry Pauline. Thereafter, Pauline, decedent and their child, Mary, lived together in decedent's home at 2304 Wales Street, Philadelphia. Subsequently, on October 5, 1913, decedent and Pauline were married by the Rev. Halaron Yakimowycz in the Ukrainian Catholic Cathedral of the Immaculate Conception, 816 North Franklin Street, Philadelphia. William Shafter, brother of decedent, was one of the two witnesses whose signature, "William Shewchuk" (his original name), appears upon the marriage certificate.

---

[1] At the hearings held in 1963 and 1964, the administrators and their counsel indicated that they did not know where she was born, but thought it was in Poland or the Ukraine. However, Peter Salabay testified in the current hearings that Pauline told him her birthplace was Trembolia, Galicia, then a part of Austria. Genealogist Herbert U. Davis testified that she was born in Borochivci, District of Terebovila, Western Ukraine, formerly Trembolia.

In or about 1915, Pauline abandoned the home of decedent for some months. During her absence, Dorothy Zerkas lived in decedent's home and took care of Mary, who was then about six years of age. In 1916, Pauline returned to decedent's home. Soon thereafter, Pauline permanently left decedent's home and took their daughter, Mary, with her to New York City, N. Y. There is some question as to whether she left with another man or subsequently met him in New York. In any event, it is undisputed that shortly after her departure from decedent's home she began to live with that man, and never thereafter returned to decedent's home or communicated with him.

Decedent died, intestate, on February 12, 1962, in the home of his brother, William Shafter, at 965 North Second Street, Philadelphia. During his lifetime, he had lived frugally. He was almost a recluse. He spent little. He joined nothing. He belonged to no organizations. From his wages as a laborer, he saved regularly and accumulated an estate of almost $150,-000.

Shortly after decedent's death, his sister, Dorothy Zerkas and his brother, William Shafter, went to the office of Willaim C. A. Henry, Esq., who had represented Dorothy Zerkas in other legal matters. They retained Mr. Henry to represent them in connection with decedent's estate. Although Dorothy Zerkas and William Shafter knew that they had a sister, Maria Arsak, who lived in the Ukraine, U.S.S.R.; that decedent had married Pauline Rogowska in a church ceremony on October 5, 1913,[2] thereby legitimating their daughter, Mary, born on December 4, 1909; and that his wife had left decedent in 1916, taking their daughter with her, they deliberately lied to Mr. Henry, stating that, as brother and sister of decedent they

---

[2] No evidence was produced at the hearings to show incapacity of either to marry.

were his only next of kin, and that decedent had no wife or child or other relative who had rights equal to, or superior to, their rights under the Intestate Act of 1947, as amended. In furtherance of this duplicity, Mrs. Zerkas, upon the instructions of her brother, William, when giving the information at the police station requisite for the coroner to issue a death certificate, stated that decedent was unmarried; hence, the death certificate contains the statement that decedent died "single."

Relying upon the foregoing information supplied by Mrs. Zerkas and Mr. Shafter, Mr. Henry prepared a petition for grant of letters of administration, which averred these facts. This petition, which is part of Exhibit C-25, was filed with the Register of Wills of Philadelphia County on February 23, 1962. Dorothy Zerkas and William Shafter signed the petition and under oath swore to the truth of the allegations therein, namely, that they were decedent's only next of kin. This affidavit falsely implied that he was not married and had no children or other close relatives. Relying upon this petition and the false, sworn statements appearing therein, the register of wills issued letters of administration to Dorothy Zerkas and Willaim Shafter and required a surety bond in the amount of $175,000 . . .

Subsequently, while going through decedent's papers found in his safe deposit box and his home, Mr. Henry discovered decedent's naturalization documents, which clearly revealed that he had a wife and a daughter. Mr. Henry thereupon confronted the administrators with this information; accused them of fraud and deceit; told them that he would no longer represent them; and ordered them to take the estate file out of his office and to retain other counsel. Shortly thereafter, the administrators returned to Mr. Henry's office; begged him to continue to repre-

sent them in the administration of the estate; promised to reveal the truth to him; and finally persuaded him to continue to represent them. Despite their promise to be truthful, the administrators persisted in their position that there was real doubt that decedent had married Pauline Rogowska; that a child had been born; and, if so, that that child was legitimate. This position is reflected in the affidavits of Dorothy Zerkas and William Shafter, administrators, filed by them in accordance with Orphans' Court Rule 69.4 and 69.5 and sworn to under date of March 28, 1963, which aver, inter alia,

"WILLIAM SHAFTER, deponent, avers that his deceased Brother, JOHN SHEWCHUK, was never married; that JOHN never introduced any woman to your deponent as his wife, nor did he ever introduce any girl as his daughter;

"WILLIAM SHAFTER, deponent, makes this averment even though the decedent, in his application for Naturalization, had stated that he was married and that he had a daughter; . . .

"WILLIAM SHAFTER, deponent, avers that his Brother, JOHN, told him on several occasions that he made the statements that he was married because it helped him either to get a job or to hold a job, especially in times of depression;

". . .

"Deponents firmly believe that there is no Official Marriage Record for JOHN, their deceased brother, and a woman named PAULINE ROGOWSKA, with whom deponents believe the decedent had been living in approximately the year 1908 or 1909;

"Deponents believe there is no Birth Certificate for any so-called Daughter, MARY SHEWCHUK; . . ."

This position is also reflected in the questions contained in the proposed statement of distribution

filed by the administrators with this court at the first call of their account for audit on April 1, 1963, viz.:

"(1) Did the decedent leave surviving him a wife, referred to as Pauline Rogowska, who would be entitled to share in this estate?; (2) Did the decedent leave him surviving a daughter, referred to as Mary Shewchuk, who would be entitled to share in this estate?; and (3) Are William Shafter, Dorothy Zerkas and Maria Arsak the only heirs?"

Finally, in early January 1964, Mr. Shafter summoned Mr. Henry to his deathbed, and there admitted that he had deceived and lied to Mr. Henry. He then stated that, in fact, decedent had been married to Pauline Rogowska; that the child, Mary, had been born beforehand; and that Mary had been legitimated by the subsequent marriage, which he had personally witnessed. He then begged deathbed forgiveness of Mr. Henry, stating that he knew he was about to die and, in fact, he died within a week on January 12, 1964.

Notwithstanding Mr. Shafter's confession, as late as the recent hearings in 1970, Mrs. Zerkas persisted in casting doubt upon the paternity of Mary, although she admitted that she took care of her while Pauline was away from decedent's home in 1915 during her first separation from decedent.

Decedent's estate first came before the undersigned auditing judge at the call of his monthly audit list on April 1, 1963 . . .

The court inquired as to whether accountants had given notice to the Commonwealth of Pennsylvania that Maria Arsak lived behind the "Iron Curtain" and, when informed that they had not done so, continued the audit to enable the accountants to take this step.

The estate was again listed for audit on March 2, 1964, and thereafter on April 9, 1964. On the latter date, voluminous testimony was presented by Dorothy Zerkas, other witnesses who knew decedent, and finally by Herbert U. Davis, an expert genealogist, as to the efforts made to locate Pauline Rogowska Shewchuk and Mary Shewchuk. Additional steps were suggested by Mr. Davis. Thereupon, the auditing judge ordered additional advertising in conformity with Mr. Davis' suggestions and continued the audit for this purpose.

The estate was next called for audit on December 14, 1964, and Genealogist Davis again testified as to the additional efforts made to locate decedent's wife and daughter. He concluded with the expression of his opinion that in view of the extensive search made for the missing wife and daughter, the advertising in many newspapers in various cities, their absence for almost 50 years, and their age, if living, there was little likelihood that the wife and/or daughter would ever be found.

Accordingly, the auditing judge filed an adjudication, dated December 29, 1964, ruling, inter alia, (1) that his wife, Pauline, having deserted the decedent, was not entitled to any share of his estate, whether alive or dead; and (2) that his daughter, Mary, having been absent for almost 50 years without any word of, or from her, despite ·the aforesaid extensive advertising and search, was a presumed decedent. In view of this, he awarded the net balance of principal of decedent's estate, including the $2,500 proceeds of the group life insurance policy and the $5,000 proceeds of the trust for Mary in the Liberty Federal Savings & Loan Association, in the total amount of $91,523.41, and income thereon of $12,-284.45, in three equal shares to Dorothy Zerkas,

Maria Arsak, and Elizabeth Pasquay, Executrix of the Estate of William Shafter, Deceased, or a total of $33,791.62 to each. The share of Dorothy Zerkas was awarded directly to her. The share of William Shafter, Deceased, was awarded to Elizabeth Pasquay, Executrix of his estate and, in turn, as the principal part of his net estate this was awarded by Judge Bolger to the beneficiaries of the Shafter Estate, including blocked accounts in the name of George A. Butler, guardian of the estates of Katherine Kij and Mary Kij, which are still subject to the jurisdiction of this court. The share of Maria Arsak was awarded to the Secretary of Revenue of the Commonwealth of Pennsylvania under the "Iron Curtain Act" of July 28, 1953, P. L. 674; and subsequently, on June 28, 1968, was awarded to William C. A. Henry, attorney-in-fact for Maria Arsak, pursuant to Struchmanczuk Estate, 44 D. & C. 2d 155, 18 Fid. Rep. 186 (1968), decided by this court. Transfer Inheritance Tax at the rate of 15 percent in the amount of $15,789.47, less discount of $789.47, was paid to the Commonwealth of Pennsylvania on the estate so awarded . . .

A schedule of distribution was filed; it was approved by the auditing judge on April 14, 1965. Distribution was made in accordance therewith and satisfactions of award were executed and filed with the clerk of court in 1966.

On July 30, 1969, Mary Voulgaris filed a petition to open and vacate the aforesaid adjudications and to rule that she was decedent's daughter and closest next of kin . . . An amended petition, dated November 19, 1969, was filed by Mary Voulgaris, which prayed the court (1) to review, open and set aside (a) its adjudications, dated December 29, 1964, and June 28, 1968, which adjudicated Mary Shewchuk,

decedent's daughter, to be a presumed decedent and awarded his estate to Dorothy Zerkas, Maria Arsak, and Elizabeth Pasquay, Executrix of the Estate of William Shafter, deceased; and (b) the schedule of distribution, approved April 14, 1965; (2) to adjudicate that Mary Voulgaris is decedent's daughter and closest of kin, and, therefore, entitled to his estate; (3) to order that restitution be made by Dorothy Zerkas; by William C. A. Henry, Esq., attorney-in-fact for Maria Arsak; by Elizabeth Pasquay, executrix of the Estate of William Shafter, deceased, and by the individuals to which his estate was awarded, and (4) to order the Commonwealth of Pennsylvania to pay back to the administrators the inheritance tax received, and approved by these adjudications, over and above the two percent inheritance tax to which the Commonwealth was entitled upon assets awarded to the daughter, a lineal; and (5) to grant such other relief as it deems just and equitable . . .

Thereafter, answers, new matter and replies were filed. The case is now before the court for disposition upon the amended petition, answers and replies. Administrative Judge Klein assigned the case to the undersigned for hearing and disposition.

Hearings were held on April 20, 21, 22, 23, 24 and 28, and May 4 and 27, 1970.

The hearing judge is satisfied that the evidence presented in this case meets the well-recognized Pennsylvania standard of proving the kinship of an heir to a decedent, as set forth in the leading case of Link's Estate, 319 Pa. 513, 522 (1935) . . .

Accordingly, the hearing judge makes the following findings of fact:

1. A daughter, named Mary, was born to John Shewchuk and Pauline Rogowska, out of wedlock, on December 4, 1909, in Philadelphia, Pa. The child was delivered by a mid-wife and the birth was officially recorded. This daughter was baptized at the Cathedral of the Immaculate Conception on December 11, 1909, by Rev. Joseph Boyarchuk. Throughout his life, decedent recognized Mary as his daughter.

2. John Shewchuk and Pauline Rogowska applied for a marriage license on October 2, 1913, in Philadelphia, Pa. Each claimed to be single with no prior marriages. They were married by a priest on October 5, 1913, in the Ukrainian Catholic Church of the Byzantine Rite, Philadelphia, Pa. William Shewchuk (Shafter), brother of decedent, was one of the witnesses.

3. Petitioner has personal graphic recollection: (a) of living with her father, the decedent, and Pauline Rogowska Shewchuk, her mother, both of whom spoke Ukrainian, in the Franklin Street area of Philadelphia (although she does not remember the exact address), until her mother took her away from decedent's home at the age of six or seven; (b) her parents' wedding and the reception afterwards; (c) that her mother told her she was delivered by a mid-wife; (d) the Ukrainian Catholic Cathedral and the death of the Bishop. (This latter incident was recalled by Dorothy Zerkas and corroborated by Monsignor Losten as being the funeral of Bishop Ortynsky.)

4. Petitioner first attended school in Philadelphia under the name of Mary Smith, since "Shewchuk" was difficult to pronounce.

5. In 1915, petitioner's mother, Pauline, left her and her father, the decedent, in Philadelphia for a short time. Dorothy Zerkas took care of her during this period.

6. In 1916, petitioner's mother returned to decedent's home where she stayed for a short time. Soon thereafter, her mother left decedent's home permanently, taking her with her. They first lived in New York City.

7. Shortly afterwards, Matthew Christy started to live with her mother and petitioner and thereafter her mother was known as Anna Christy, and petitioner was known as Maria Christy.

8. Petitioner often asked about her father but her mother forbade such conversation. Likewise, her mother refused her requested permission to go to visit her father in Philadelphia.

9. In August of 1954, petitioner's mother wrote to Philadelphia and obtained a certified copy of her marriage certificate for Social Security purposes. At the time, she was represented by an attorney, George Papazoglou, Esq., of Danbury, Conn. This marriage application and certificate is the same as Exhibit C-2 obtained by Herbert U. Davis, genealogist, which is part of the prior record.

10. After her son's entry into the United States Air Force, when a national security check was being processed, petitioner advised him that his actual grandfather was John Shewchuk, of Philadelphia.

11. Exhibit C-8 is a photograph which depicts petitioner's father, decedent, and mother, Pauline, immediately after their marriage. This photograph was obtained from the personal effects of her mother and Christy immediately after his death in 1954. Exhibit C-16 is a photograph taken from Mr. Henry's files, which was given to him by Mrs. Zerkas. It depicts three persons, two of whom are decedent and petitioner's mother shortly after their marriage. They are the same persons as those appearing in Exhibit C-8.

13. On July 1, 1952, decedent named his daughter,

Mary, as beneficiary of #804A9 group life insurance policy issued by the Metropolitan Life Insurance Company in the amount of $2,500.

14. Less than three months before his death, decedent named his daughter, Mary, the beneficiary of a trust of $5,000 in the Liberty Federal Savings and Loan Association.

15. Decedent recognized Mary as his daughter from birth. He told many people that he had a wife and daughter and that his wife had run away with another man in 1916, taking their daughter with her.

16. Not long before his death, decedent told John Costello that if he could find his daughter he would immediately give her $25,000.

17. Mrs. Zerkas' counsel admitted of record that decedent was the father of the daughter shown on the birth certificate.

18. Decedent's daughter had a mark "like a birth mark around her left shoulder." Petitioner physically exhibited such markings in open court. These are the described birth marks.

19. Long before decedent's death, petitioner and her mother, Pauline, told many persons, including Stephanie Mazur, Peter Salabay, Melanie Salabay, Walter F. Salabay and Anne K. Salabay that petitioner was the daughter of decedent who lived in Philadelphia. Moreover, Christy told John Voulgaris and others that he was *not* petitioner's father.

20. Petitioner, Mary Voulgaris, is decedent's legitimate daughter. She was born out of wedlock in 1909, but was legitimated by the marriage of petitioner's father, decedent, and mother, Pauline, in 1913.

\*       \*       \*

Accordingly, the hearing judge finds as a fact and concludes as a matter of law, that:

1. petitioner is decedent's daughter;

2. she is decedent's closest next of kin; and

3. under the Intestate Act of 1947, as amended, she was entitled to decedent's entire net estate on December 29, 1964.

\*      \*      \*

In conclusion, the primary beneficiary, Mary Voulgaris, had an absolute right under the Intestate Act to the net estate of decedent on December 29, 1964, the date of the adjudication here attacked. Since that estate was distributed to Dorothy Zerkas, Elizabeth Pasquay, the Executrix of William Shafter, Deceased, and Maria Arsak, under mistake of fact that petitioner was dead and she is, in fact, alive, petitioner is entitled to an award of that net estate, and the administrators are bound to distribute it to her.

*The Administrators of Decedent's Estate*
*Have an Additional Duty to Distribute*
*Decedent's Property to his Actual Next*
*of Kin*

Administrators of an estate, as fiduciaries, are ever subject to the jurisdiction and decrees of the orphans' court. From the moment of their appointment as administrators until their ultimate complete discharge, they remain bound by the lawful rights, liabilities and responsibilities of fiduciaries. A fundamental precept is that a fiduciary may not benefit from his own act to the disadvantage of a beneficiary of a decedent's estate. Therefore, from the beginning of the administration to the conclusion thereof, the person properly entitled to decedent's estate has superior rights to the administrators' individual rights. It is unthinkable that administrators, by any acts of theirs, fraudulent or faithful, should benefit to the detriment of the actual closest next of kin.

\*      \*      \*

The administrators of decedent's estate may not hold, for their individual use, two-thirds of his substantial estate to the exclusion of his daughter who has a superior right thereto. It follows that at least Dorothy Zerkas and the Estate of William Shafter, deceased, have a special obligation to make restitution to petitioner of the assets which were distributed to them out of the Estate of John Shewchuk, deceased. See Vogest's Estate, 31 D. & C. 169 (1937).

### Fraud of Administrators

The administrators have been guilty of fraud and deceit from the outset of the instant case. This fraud consisted of:

1. Mrs. Zerkas was the informant who supplied the false information contained on the death certificate. This certificate incorrectly stated that John Shewchuk was a single man.

2. The administrators knew that they had a sister, Maria Arsak, living in the Ukraine, behind "the Iron Curtain," yet they deliberately told their attorney, William C. A. Henry, Esq., and certified under oath to the register of wills that they were the only next of kin.

3. The administrators knew that decedent was married by formal marriage ceremony to Pauline Rogowska in December 1913 and that prior thereto in 1909, there was born to Pauline Rogowska a daughter, Mary, whom decedent had recognized as his daughter. William Shafter was present at the marriage ceremony and, in fact, was a witness signatory to the marriage certificate. Mrs. Zerkas admitted on the witness stand that she was present at the wedding or the reception which followed. Both administrators knew that Pauline Rogowska Shewchuk and Mary Shewchuk had abandoned decedent's home in 1916. They also knew that decedent had named his daughter as beneficiary of a trust of $5,000 in a building and loan as-

sociation and had named her as beneficiary of a group life insurance policy in the amount of $2,500. Notwithstanding this knowledge, both Dorothy Zerkas and William Shafter averred under oath in the register of wills' office that they were the only next of kin.

4. At the first audit of their account as administrators, the proposed statement of distribution signed under oath by them raised the question as to whether or not decedent had been married and had a child.

5. In the administrators' affidavit, prepared and filed under Orphans' Court Rules 69.4 and 69.5, there is the averment that "John Shewchuk was never married, and that John never introduced any woman to your deponent as his wife, nor did he ever introduce any girl as his daughter." Mrs. Zerkas admitted on the witness stand on April 22, 1970, that the averment was false and that she "was at the marriage ceremony."

6. When the petition for amended letters of administration was filed in December 1964, following Mr. Shafter's death, it was falsely stated that Dorothy Zerkas and William Shafter were decedent's sole next of kin.

7. Until 1964, both administrators persisted in their assertions to their counsel, William C. A. Henry, Esq., that decedent was not married and did not have a child. However, on his deathbed in January 1964, Shafter acknowledged to Mr. Henry that he had lied and had been guilty of deceit and fraud.

8. As late as the next to final day of the present hearings, Mrs. Zerkas in open court called genealogist Herbert U. Davis aside and offered him a bribe to testify that petitioner was *not* decedent's daughter.

The pertinent law relating to such fraud is succinctly stated in White's Estate, 249 Pa. 115, 120 (1915):

"Before a fund of this character has been paid out, it is in the power of the court to grant a review for the

correction of any mistakes shown to have been made; and indeed this much is required of the court, under the Act of October 13, 1840, P. L. 1 (1841), Kinter's App., 62 Pa. 318; Lehr's App., 98 Pa. 25; Bear's Est., 162 Pa. 547. Where, however, the fund has been paid out in accordance with the terms of decree, a bill of review will not lie as matter of right, *but only where fraud has been shown to have induced the decree, this latter being an indispensable condition.* Russell's Admrs. App., 34 Pa. 258. . . . While the review does not lie as a matter of right to correct errors after the fund has been paid out, yet *if fraud be shown to have entered into the decree or induced it, notwithstanding the fund has been paid out, the court may, in the exercise of a sound discretion direct a review,* Yeager's App., 34 Pa. 173. . . ."

\* \* \*

The administrators' fraud started at the register's office and continued until the end of the current hearings, when Dorothy Zerkas tried to bribe Herbert U. Davis. The type of fraud varied but continued. The administrators' nefarious purpose was to obtain all, or at least two-thirds, of decedent's estate for themselves.

If the register of wills had been informed of the truth in this case, namely, that decedent had a wife and daughter who left decedent in 1916, and that he had a sister, Maria Arsak, who resided in the Ukraine behind the "Iron Curtain," the register probably would not have granted letters of administration to Mrs. Zerkas and Mr. Shafter, at least until a formal renunciation had been signed by Maria Arsak and until some prior search had been made to ascertain whether decedent's wife and daughter were still alive. In all probability, the register, recognizing the conflict of interest between Dorothy Zerkas and Wil-

liam Shafter on the one hand and the missing wife and daughter and possibly the sister, Maria Arsak, on the other hand, would have refused to grant letters of administration to Mrs. Zerkas and Mr. Shafter and would have appointed his own impartial nominee.

If an impartial administrator had been appointed, there would have been no question as to whether or not a conflict of interest prevented him from making a full and fair search from the very moment of appointment for the missing wife and daughter. Thereby, at least a year and a half or two years would have been saved in the search for petitioner and it is entirely possible that such impartial administrator would have located her.

\* \* \*

The orphans' court, with its equitable powers, will not permit administrators to benefit by their own deliberate fraud to the disadvantage of an actual heir: Vogest's Estate, 31 D. & C. 169 (1937). In that case, . . . Judge Klein concluded, at page 174:

"A study of [the] cases leads us to the following conclusions: . . . that it has for its object the protection of administrators in the event of a *bona fide distribution of the personal assets of the deceased without notice or knowledge of the existence of next of kin* entitled to participate in the distribution of the estate.

\* \* \*

". . . The administrator, as well as the court, has knowledge of the fact that at the time of the decedent's death she left a husband entitled to take. The fact that he did not appear 'to lay legal claim' to his share *is unimportant because the administrator stands in a trust relationship to all of the next of kin, and a demand by them is not necessary.* The husband, in

this case, had the right to sit by without taking any action relying upon the administrator's obligation to deliver to him his distributive share of the estate: Merrick's Estate, 1 Ash. 305." (Italics supplied.)

It follows that the administrators must disgorge the awards heretofore made to and through, them and pay these funds over to petitioner.

\* \* \*

### Mrs. Zerkas' Promise of Restitution

There is additional, compelling reason which makes Mrs. Zerkas especially liable to reimburse petitioner for the full amount of principal and income of decedent's estate heretofore awarded to her. That is her promise made at the audit on April 9, 1964, as follows:

"Q. So you would lose about $30,000 [if the daughter were alive] ?

"A. They would be glad to take it. I would be glad to give it to her. She can have it. She can have it. You give me that money in my pocket and she come along and I'll still give it to her. I'm not after nobody's money, but I know she will never be found."

The auditing judge interpreted this as an absolute promise by Mrs. Zerkas that in the event decedent's daughter was adjudicated a presumed decedent and later appeared in court, Mrs. Zerkas would willingly, cheerfully and without contest turn over to her whatever was awarded to her by the auditing judge. This made the finding by him that the daughter was a presumed decedent and his award of a one-third share of decedent's estate to Mrs. Zerkas an easier task. It now comes with very poor grace for Mrs. Zerkas not only to fail to comply with her promise, but to vigorously oppose any restitution to decedent's daughter, even to the point of offering a bribe to the genealogist for false testimony.

When reminded of this promise by the court during the recent hearings, Mrs. Zerkas answered that she was fighting petitioner now, because the latter had not come forward as a loving niece and asked her for the money. Implicit in this testimony, was the recognition by Mrs. Zerkas that petitioner is decedent's daughter. However, consistent with Mrs. Zerkas' fraudulent conduct from the date of decedent's death to the present, she now is bitterly and vigorously opposing any award to petitioner.

### Notice to All Respondents

All of the parties have had notice of these proceedings. Throughout the hearings, all parties but one have been represented by counsel, namely, the Estate of William Shafter, deceased; however, Elizabeth Pasquay, executrix of that estate, was present throughout the hearings. The court suggested to her the advisability of retaining counsel and warned that if petitioner's position prevailed she, as executrix, and the distributees of the Shafter Estate might be held liable.

### Liability of Administrators

For the reasons set forth above, the auditing judge rules that the administrators are liable to return the entire principal and income heretofore awarded to them and Maria Arsak in the adjudications of December 29, 1964, and June 28, 1968, and the schedule of distribution thereafter approved by the court.

### Conclusions

From the foregoing reasoning, the hearing judge reaches the following conclusions of law:

1. Petitioner, Mary Voulgaris, is the legitimate daughter of decedent;

2. The adjudication of December 29, 1964, and June 28, 1968, and the schedule of distribution approved April 14, 1966, are opened and set aside;

3. As daughter of decedent, petitioner Mary Voulgaris is decedent's closest of kin and, therefore, under the Intestate Act of 1947, as amended, is entitled to the balance of principal and income in decedent's estate as of December 29, 1964.

4. Dorothy Zerkas, surviving administratrix, is liable to recover the entire balance of principal and income awarded under the adjudication dated December 29, 1964, with interest thereon from the date of this adjudication.[4]

5. There is no need at this time to consider the liability of (a) Elizabeth Pasquay, executrix of the Estate of William Shafter, deceased; (b) the distributees of that estate, including George A. Butler, guardian of the minors' estate; (c) William C. A. Henry, as attorney-in-fact for Maria Arsak; and (d) Fidelity and Deposit Company of Maryland, surety. It is to be noted that William C. A. Henry is an able, experienced and well-respected attorney, who has conducted himself with fidelity, honesty and frankness throughout the administration of this estate.

Accordingly, the adjudications of December 29, 1964, and June 28, 1968, are hereby opened and set aside, and the net balance of principal in the amount of $91,523.41, as therein set forth, together with income thereon in the amount of $12,284.45, or a total of $103,807.86, are hereby awarded to Mary Voulgaris,

---

[4] Although an award to a daughter usually carries with it interest at six percent, or at the rate earned, from the date of death, in the exercise of this court's broad equitable powers and discretion, the auditing judge declines to allow such interest on this award. It is true that the other distributees have had the use of these funds; however, only by this adjudication is the right of Mary Voulgaris to receive the fund determined; moreover, petitioner has not been zealous in searching for her father and she has been guilty of falsehood under oath. Accordingly, the auditing judge allows interest on the award herein made from the date of this adjudication only.

daughter of decedent, subject to inheritance tax at two percent, with credit and right of refund for the amount heretofore paid with interest thereon at six percent from the date hereof. Leave is hereby granted to the accountant to make such recoveries of awards heretofore paid and such assignments as are necessary.

And now, to wit, July 8, 1970, the adjudication heretofore filed, as modified herein, is confirmed nisi.▪

*W. Wesley Nagle, Richard P. Brown, Jr.,* and *Morgan, Lewis & Bockius; Edmund P. Butler, James J. Martin,* and *Herbert W. Salus, Jr.,* Special Assistant Attorney General, for exceptants.

*Walter T. Darmopray* and *Hamilton, Darmopray, Malloy & Milner,* contra.

### EXCEPTIONS TO OPINION

SHOYER, J., December 21, 1970.—The exceptions in this case strike at the very essence of the power of the court to protect the beneficiaries of a decedent's estate from the fraudulent and deceitful conduct of administrators entrusted to properly administer the estates of decedents. We are of one mind that the exceptions are completely devoid of merit.

" 'The administration of the estate of a decedent is one indivisible judicial proceeding, from the grant of letters appointing the administrator until his [valid] discharge. The administrator while functioning is at all times under the control and direction of the orphans' court. He is, in a sense, an officer of the court and any property received by him as administrator may be regarded as in the custody of the court' ": Webb Estate, 391 Pa. 584, 590 (1958).

The conduct of the administrators, decedent's sister

and brother, reeks of fraud and deceit from the moment of the grant of letters to the final hearing.

Judge Lefever, by decree of July 8, 1970, opened and modified his earlier adjudication of December 29, 1964, and, in so doing, awarded the entire estate of John Shewchuk to Mary Voulgaris, daughter of decedent, instead of to decedent's brother and two sisters, the previous distributees.

The issues raised by the exceptions are (1) the identity of Mary Voulgaris, who was known for most of her youth as Mary Christy, with Mary Shewchuk who was born in 1909, (2) the restrictive effect of section 721 of the Fiduciaries Act of April 18, 1949, P. L. 512, which authorizes review of an adjudication within five years, but not "as to any property distributed by the personal representative in accordance with a decree of court before the filing of the petition," and (3) the liability of Dorothy Zerkas, the surviving administratrix, to recover the entire balance of principal and income awarded under the adjudication of December 29, 1964.

John Shewchuk, a longtime resident of Philadelphia, died intestate in this city on February 12, 1962. Letters of administration were issued on February 23, 1962, to Dorothy Zerkas and William Shafter, decedent's sister and brother, who averred in their petition to the register of wills that they were decedent's sole next of kin. They were represented by William C. A. Henry, Esq., a learned and well-respected member of the bar of this court. Subsequently, information came to Mr. Henry that decedent had married one Pauline Rogowska on October 5, 1913, in Philadelphia, and had thereby legitimated a daughter, Mary, who had been born on December 4, 1909, and of whom decedent was the natural father.

William Shafter, brother of decedent, was one of the two witnesses whose name appears upon the marriage

certificate, and Dorothy Zerkas, during the 1970 hearings, admitted that she, too, was present at the ceremony.

In or about 1915, Pauline left decedent's home for some months. During her absence, Dorothy Zerkas lived in decedent's home and took care of Mary, then about six years of age. In 1916, Pauline returned but soon left decedent's home forever, taking her daughter, Mary, with her. Despite this information which Mr. Henry had obtained through an investigator, much of it was persistently denied by the coadministrators.

On March 28, 1963, they even swore to an affidavit that decedent was never married, despite the fact that Mr. Henry presented them with evidence that decedent, in his application for naturalization, had stated that he was married and had a daughter. They also swore to their firm belief that there was no official marriage record for John, their deceased brother, and a woman named Pauline Rogowska with whom deponents believed "the decedent had been living in approximately the year 1908 or 1909."

In January 1964, William Shafter summoned Mr. Henry to his deathbed and admitted that he had deceived and lied to Mr. Henry as to the birth of the child, Mary, and the subsequent marriage of decedent with Pauline Rogowska, which marriage he had personally witnessed. He then begged deathbed forgiveness of Mr. Henry and died on January 12, 1964.

Dorothy Zerkas on her amended petition to the register of wills was then granted letters of administration as sole administratrix.

On December 29, 1964, Judge Lefever duly adjudicated the estate of John Shewchuk and awarded the balance of $103,807.86 in three equal shares to Dorothy Zerkas, to the estate of William Shafter, and to a sister, Maria Arsak, who lives in the Ukraine, U.S.S.R. Zerkas and Shafter had belatedly acknowledged the existence of this sister, giving as their

reason for concealment that after the estate was settled they planned to send her one-third of the balance and thus evade the restrictions imposed by the Iron Curtain Act of July 28, 1953, P. L. 674.

In his adjudication dated December 29, 1964, the learned auditing judge ruled that the wife, Pauline Rogowska, having deserted decedent, was not entitled to share in his estate, and that the daughter, Mary, was a presumeed decedent. Included in the net balance of principal of decedent's estate were $2,500 proceeds of a group life insurance policy which named decedent's daughter as the beneficiary on July 1, 1952. There were also included the proceeds of a savings account amounting to $5,000 which decedent had opened in his name in trust for his daughter, Mary, less than three months before his death.

On April 14, 1965, the schedule of distribution was approved which showed payment of the share of Maria Arsak to the Commonwealth. On May 27, 1966, the administrators were discharged. On June 28, 1968, following the decision of this court in Struchmanczuk Estate No. 2, 44 D. & C. 2d 155, 18 Fiduc. Rep. 186 (1968), the share of Maria Arsak was awarded to Mr. Henry who held her power of attorney.

Meanwhile, on July 1, 1965, the testamentary estate of William Shafter was audited in this court and the balance was awarded in proportionate shares to various legatees, including George A. Butler, guardian of the estates of Katherine and Mary Kij, minors.

On July 30, 1969, Mary Voulgaris, alleging that she was the missing daughter of John Shewchuck, filed her petition to open the adjudications of 1964 and 1968. Pursuant to the petition as amended, the court issued citations to all interested parties, including the Commonwealth. Judge Lefever, after hearings which extended over a period of five and a half weeks, entered a decree on July 8, 1970, in which he opened his earlier adjudications and found as a fact and concluded

as a matter of law that Mary Voulgaris, the petitioner, is decedent's daughter, and closest next of kin, and that under the Intestate Act of April 24, 1947, P. L. 80, she is, and was as of December 29, 1964, entitled to decedent's entire estate. In his opinion, he made 20 separate findings of fact and held, inter alia, that: "Dorothy Zerkas, surviving administratrix, is liable to recover the entire balance of principal and income awarded under the Adjudication dated December 29, 1964, with interest thereon from the date of this Adjudication."

Dorothy Zerkas denies the identity of Mary Voulgaris in her exceptions, attacking claimant's credibility chiefly on the ground that in 1954 in probate proceedings in Bethel, Conn., she had stated that she was the daughter of Matthew Christy. Since the only asset in the Christy estate was an old automobile which she obtained for her mother, who had been living with Matthew Christy and had been publicly acknowledged as Mrs. Christy since 1916, it is evident that she was motivated not by venality but by a desire to aid her mother in winding up a small estate to which there were no other claimants. The issue before the learned hearing judge was always her identity as the daughter of John Shewchuk and, in ascertaining the ultimate truth, the court was supported in his finding by the testimony of others, including that of Dorothy Zerkas. The latter's admission that she "always thought" that the man Pauline Rogowska ran away with was named Christy, the scarred indentations on the neck of Mary which her aunt referred to as birthmarks, the duplicate group photographs of father, mother and daughter taken shortly after the wedding, one coming from William Shafter, the other produced by Mary Voulgaris, comprise the strongest evidence, and this Dorothy Zerkas has not refuted. On the contrary, she has confirmed it. At the 1964 audit, Dorothy Zerkas had promised to turn over the estate

to Mary should she ever appear. She recanted in 1970, not because she doubted Mary's identity, but because she no longer has the money, and in her words: "If she had come along like a lady in time and came to me and treated me like I was her aunt, I would be glad to. I don't have it now. That was over five years ago." Certainly, her denial of Mary's identity is not based on any genuine doubt that Mary is actually her niece.

Every opportunity was afforded Dorothy Zerkas and the other contestants to rebut the claim of Mary Voulgaris. Although Mrs. Zerkas's petition for discovery was denied, there was no abuse of discretion by the learned auditing judge because ample opportunity was given exceptants to investigate Mary's claim and to prepare their defense. Mary Voulgaris was the first witness called to the stand at the first of eight separate hearings and she was also the last witness some five and a half weeks later. The name "Christy" was not unfamiliar to Dorothy Zerkas. The original and long-held suspicion of the administratrix that Mary and her mother had left with a man named Christy was confirmed by a wealth of cumulative evidence, both documentary and oral. In the intervening 55 years, there were no unexplained gaps as to Mary's whereabouts. As a six-year-old child in the custody of her mother who had deserted John Shewchuk to live with another man, Mary was naturally dominated by Pauline Rogowska Shewchuk as to the name she should adopt at school and in the neighborhoods in which they resided. Her right of recovery in this court depends not on the equitable doctrine of clean hands, but on the quality of her proof as the legitimated daughter of John Shewchuk. It would be clear error and a legal fraud for this court to deprive Mary Voulgaris of her inheritance as the daughter of John Shewchuk and his sole intestate heir.

All exceptants, save the Commonwealth, contend that the distribution made by Dorothy Zerkas under

the previous awards is a bar to Mary Voulgaris's recovery under section 721 of the Fiduciaries Act of April 18, 1949, P. L. 512, 20 PS §320.721, which reads:

"Section 721. Rehearing; relief granted. If any party in interest shall, within five years after the final confirmation of any account of a personal representative, file a petition to review any part of the account, or of an auditor's report, or of the adjudication, or of any decree of distribution, setting forth specifically alleged errors therein, *the court shall give such relief as equity and justice shall require:* Provided, That this section shall not authorize review as to any property distributed by the personal representative in accordance with a decree of court before the filing of the petition. The court or master considering the petition may include in his adjudication or report, findings of fact and of law as to the entire controversy, in pursuance of which a final order may be made." (Italics supplied.)*

In our consideration of this statute, we start with the basic proposition that no fiduciary may profit at the expense of a beneficiary. Restatement 2d, Trusts, §170, states the rule that a "trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." For the purpose of this rule, there is no distinction between a personal representative and a trustee: Miller v. Hawkins, 416 Pa.

---

* By Act No. 108 of May 5, 1970, the words "Provided, That this section shall not authorize review as to any property distributed by the personal representative in accordance with a decree of court before the filing of the petition . . ." were amended so that they now read: "Provided, That no such review shall impose liability on the personal representative as to any property which was distributed by him in accordance with a decree of court before the filing of the petition." Although this amendatory legislation is by its terms to take effect immediately, it is our opinion that since its passage was more than five years after the adjudication and decree of distribution sought to be reviewed, it has no applicability in this case.

180, 194; Comerford Estate, 388 Pa. 278, 294. Section 170 has been cited with approval in Comerford Estate, supra, p. 295; Noonan Estate, 361 Pa. 26, 31; Downing Estate, 162 Pa. Superior Ct. 354, 359, affirmed 359 Pa. 534; Curtis Trust, 45 D. & C. 2d 701, 711, 19 Fiduc. Rep. 1, 12, 13, 14 (1968).

Comment w to section 170 reads: "Dealings with Beneficiary. Under the rule stated in subsection (1), if the trustee attempts to acquire an interest in the trust property without the consent of the beneficiary, the beneficiary can avoid the transaction even though the transaction was fair."

The duty of loyalty on the part of the fiduciary is so rigid as to preclude every type and variey of self-dealing. One can imagine no more extreme example of self-dealing than this case where the two personal representatives conspired to obtain the entire principal of decedent's estate for themselves and their sister. In Miller v. Hawkins, supra, page 194, our Supreme Court said:

"The action of the fiduciary in purchasing for her own interest the decedent's interest in Bradford Petroleum was flagrant self-dealing. In Meinhard v. Salmon, 249 N. Y. 458, 164 N. E. 545, the late Mr. Justice (then Judge) Cardozo said: 'A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. [Citing a case]. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.' A fiduciary may not profit at the expense of the estate or its beneficiaries . . .

and the rule forbidding self-dealing is inflexible, without regard to the consideration paid or honesty of intent: Chorpenning's Appeal, 32 Pa. 315, 316; Noonan Estate, 361 Pa. 26, 30, 32, 33, 63 A. 2d 80; Comerford Estate, 388 Pa. 278, 295, 130 A. 2d 458; Downing Estate, 162 Pa. Superior Ct. 354, 360, 57 A. 2d 710, aff'd 359 Pa. 534, 535, 59 A.2d 903."

In Marshall v. Carson, 38 N. J. Eq. 250, 48 Am. Rep. 319 (1884), the Court of Errors and Appeals said:

"The necessity of placing guards around those whose interests are entrusted to the agency and control of others, springs out of the weakness and infirmity of human nature, which observation and experience show is not proof against the seductive and insidious influence of selfish interest, and ought not to be put to the temptation to acquire personal gain through failure in, or unfaithful performance of, fiduciary obligations. It recognizes the difficulty, if not impossibility, of tracing actual fraud in every case, and the frequent failure of justice and success of wrong that must be consequent thereon, and it attempts to apply a method that will remove all temptation from the mind of the trustee to profit by infidelity in the discharge of trust duties of every sort, and which will remove all inducements to act otherwise than faithfully toward the beneficiary, by utterly refusing to consider the question of good or bad faith, and holding the trustee who attempts to deal with the trust property as an individual, to all the chances of loss, and denying to him all possible gain."

Exceptants insist that fraud, even though it was present in the application for letters by Dorothy Zerkas and William Shafter, cannot remove the bar of the statute because they claim that the initial fraud played no part in inducing the learned auditing judge

to make his awards of 1964 and 1968. But, in his decree of July 8, 1970, Judge Lefever states that he was induced to commit error by the continuing fraud and misrepresentation of Dorothy Zerkas. Mary Voulgaris might well have been located prior to the original adjudication had the various newspaper advertisements made use of the name "Christy," information known to Dorothy Zerkas which she withheld from her counsel, the investigator and the court until the instant hearings were under way. Only a few of the friends who knew Mary and her mother by the name of Christy were acquainted with the name of Shewchuk. To most of their neighbors, that name, and consequently the advertisements, meant nothing. Furthermore, fraud continued to the end of the instant hearings with Dorothy Zerkas's attempt to bribe the genealogist.

There is a more elementary reason, however, which precludes the use of section 721 as a shield for wrongdoing. The Orphans' Court in its application of equitable principles has always had the power to correct its own records and purge them of error. Tracing the origin of section 721 back through section 48 of the Fiduciaries Act of June 7, 1917, P. L. 447, to its beginning in the Act of October 13, 1840, P. L. (1841) 1, sec. 1, our courts have consistently held that the distribution referred to in the statute did not mean distribution by a personal representative to himself.

In Ehrhart's Estate, 31 Pa. Superior Ct. 120, 122 (1906), where the lower court had inadvertently awarded the whole estate of the deceased wife to the husband-administrator instead of awarding one-half to the wife's brothers and sisters, the Superior Court said that this error " 'was so gross a mistake

as to amount to a legal fraud.'" The court continued, at pages 124 and 125:

"The parties who were seeking relief were the same persons who had been injured by the former erroneous decree; the court to which they applied was the same court which had inadvertently made the mistake complained of; the party against whom the relief was sought was the identical person who alone had profited by the mistake and the relief prayed for was to compel him to restore the money wrongfully awarded to him as the result of that mistake, to those to whom it rightfully belonged.

"Under such circumstances neither the parties nor the court needed the aid of the act of 1840 to enable the former to ask for and the latter to decree the correction of the error that had been made. The power to grant such relief has always been inherent in the courts and it has been frequently decided that it was not taken away by the act of 1840.

". . . It is true the proviso to the act declares, 'that this act shall not extend to any cause when the balance found due shall have been actually paid and discharged by any executor, etc.' Plainly enough this proviso was intended for the protection of *an honest accountant* who, in pursuance of a court's decree, had actually and in good faith paid out money in his hands to another person; who had thus lost the possession and control of the fund and who could not therefore be reinstated in the position he occupied when the original decree was made. No such case is before us. The person who had the fund when the original decree was made is the same person who had it when the final judgment was entered. That he was called the 'administrator' at one time and the 'distributee' at another is of no importance. As the court below well says, 'we cannot close our eyes to

the fact that the hand to pay was the hand to receive and that the accountant, constructively at least, still has this money in his pocket.' The refinement by which the appellant would be regarded as two persons, payer and payee, accountant and distributee, and thus be enabled to call to his aid the protection which the act only intended to extend *under very different conditions,* is too subtle to be adopted by a court dealing with substantial equities." (Italics supplied).

In Kinter's Appeal, 62 Pa. 318, 322 (1869), our Supreme Court, speaking through Mr. Justice Sharswood, said:

"We must construe the Act of 1840 in the light of the old law, the mischief and the remedy . . . We must give the law a reasonable interpretation—one in accordance with its spirit, and not its letter. The body of the act expressly declares that the court shall 'give such relief as equity and justice may require.' In a great majority of cases this could not be done if the payment of the balance was a bar to all inquiry. Such a rule would be a cover to the grossest frauds purposely concealed. It was meant as a shield to the honest accountant, not as a weapon in the hands of the dishonest to perpetrate iniquity . . ."

Since the record in this case shows so clearly and unmistakably the fraud and self-dealing of the co-administrators, it follows that Dorothy Zerkas and the estate of William Shafter must disgorge their distributive shares. In Miller v. Hawkins, supra, pp. 193-196, the husband of the disloyal administratrix had received portions of the estate principal which she had obtained by self-dealing. Some had come to him by inter vivos gift, some by inheritance after the death of the administratrix. Our Supreme Court held that since the husband had given no con-

sideration for what he received, he was bound to return the proceeds of his wife's fraud. Similarly, Maria Arsak has no right to retain her one-third share. The holding of the learned hearing judge that Dorothy Zerkas, surviving administratrix, is liable to recover the entire balance of principal and income awarded under the adjudication dated December 29, 1964, with interest thereon from July 8, 1970, is properly in accord with law and equity and we approve the same.

We accept all the findings of fact made by the learned hearing judge and approve his conclusions of law. Together they "give such relief as equity and justice . . . require."

The exceptions are dismissed and the adjudication as modified by decree of July 8, 1970, is confirmed absolutely.